Dissenting Opinion.
Watkins, J.
This suit is brought against the defendant for his proportionate share of a loss sustained on a purchase of 6200 bales of cotton for future delivery, for the account of a pool alleged to have been composed of J. N. Carpenter, B. Franssen, T. L. Airey and defendant.'
The plaintiffs claim that they, as brokers, members of the New Orleans Cotton'Exchange, operating under its rules, were employed as such to purchase not exceeding 10,000 bales of cotton, or so much thereof as would “sustain the market;” and on the 14th of June, 1887, they made the purchase of 6200 bales- of cotton for August and September deliveries. The purchase was made on the Exchange, and was thereafter held by plaintiffs for the account of Carpenter & Co. — by which name the pool is designated — until the 14th of July, 1887, when the transaction was closed out under the rules of the Exchange, at then prevailing prices, on account of the plaintiffs’ suspension, and with the resulting proportionate loss demanded.
All parties in interest admit their liability except the defendant, who disavows all responsibility.
The principal question to be determined is, whether or not the defendant became a member of the pool.
It appears from the record to be an undisputed fact that only a few moments after the alleged agreement was made, Col. Airey informed Carpenter of it, and he at onee assented to it. Immediately after being thus informed, and at the suggestion of Col. Airey, Carpenter employed plaintiffs to make the purchase. Having been advised of the object to be attained by the deal, i. e., to sustain and advance the market, they ceased purchasing after they had secured 6200 bales, *1042 as they considered the market had sufficiently recovered thereby. Of this no complaint is made by any one.
Of these purchases due notice was given Carpenter & Co. at the •office of Ool. Airey, as directed by J. N. Carpenter, when he requested the plaintiffs to negotiate the purchase. Memorandaweve furnished to the parties respectively on call. Carpenter, Airey and Franssen each received theirs, but defendant has no recollection of having received his, and says, after careful examination none could be found.
Quite a number of gentlemen of the Exchange were interrogated as witnesses, and a large majority of them testify that the plaintiffs’ course of dealing in this matter was in strict conformity to the customs, usages and rules of the Exchange in such matters, that is, in ■giving a notification to the party giving the order only, and, as the defendant furnished no countervailing evidence, I think this court is bound to accept the binding force of a clear preponderance of proof on this as on any other question.
During the time plaintiffs held the cotton for the account of the pool, they made demand of the respective members for margins on their contract, same having become necessary on account of a variation in the market. In response to this demand, the defendant at •once responded with his check, which was deposited with the plaintiffs as security against loss, the time of delivery not having arrived. On the faith of this deposit of margins the plaintiffs accounted to the brokers who effected the sale, and continued to hold the cotton for the joint account of the defendant and his associates. Hence •this is simply a suit by brokers against one of its principals for the reimbursement of money expended for Ms account in sustaining a contract they were carrying for a pool, of which he was a member. To my thinking it was evidently on the faith of the margins deposited that plaintiffs parted with their money and consented to, and continued to carry the contract.
This is the plaintiffs’ side of the case.
The position of the defendant is that there was no such agreement made as the plaintiffs contend, and not that there was a conditional agreement entered into, which was dependent upon the subsequent assent of Carpenter, of which assent he was entitled to notice before it could become complete as a contract binding on him.
The testimony of the three parties who were admittedly members ■of the Exchange, and participated in the conversation in the Ex *1043 -change, which is alleged to have resulted in the pool agreement, was taken, and from which we make the following extracts, viz:
T. L. Airey, one of the three gentlemen, says: “ On the 14th of June, 1887, Franssen, Adolph Meyer and myself were discussing ■cotton and the course of the cotton market, upon the floor of the Cotton Exchange, and I made the remark, ‘ If we make a pool of 10.000 bales of cotton, we can check this decline and probably put the market up.’ We all had large interests in sustaining prices. I said I was willing to take 2500 bales. Franssen said, ‘ I will take 2500 bales.’ Adolph Meyer said, ‘ I will take 2500.’ Carpenter was not in the Exchange at the moment. I said, ‘ I am satisfied that Carpenter will take 2500 bales.’ Within a moment from the time I spoke, Carpenter came in. I walked up to him and told him what we had done. I said that Adolph Meyer had taken 2600; I the same; Frawssen the same, and (I) asked him if he would take the 2500. He said, ‘ Of course I will do it.’ ” (Italics mine.)
Again he says: “ While we were talking the door of the Exchange ■opened, and Carpenter appeared. When I left Meyer and Franssen ■to go to Carpenter, I mentioned to them, 1 There is Carpenter now.’ ” {Italics mine.)
This is a clear, concise statement of fact. Airey speaks in no ■doubtful or equivocal terms. He says: “Adolph Meyer said I will take 2500.” He says that he told Carpenter “ what we had done,” and “that Adolph Meyer had taken 2500.”
During the pendency of the suit the testimony of Franssen was taken under commission in a distant State, and he made the following statement, viz:
“ I was in conversation with Mr. Airey, and, as the market appeared unusually weak, I made the remark that the purchase of 10.000 bales would suffice to sustain the market considerably, and even cause an advance of five points at least. The suggestion was, thereupon made by Col. Airey to forma combination for the purchase of 10,000 bales, to which, Mr. Meyer and myself consented, provided ■they could induce Mr. Carpenter to take a one-fourth interest. So that each one of us participated to the extent of 2500 bales.”
Again he says:
“I am positive that Mr. Meyer gave his full assent to said transaction. I do not remember'the exact expression used, but the amount of our conversation was that he would take the quarter interest, if *1044 Mr. Airey, Mr. Carpenter and myself * * would take the other-three-quarters interest. Mr. Meyer spoke to me, as well as to Mr.. Airey, during the conversation which occurred in the New Orleans-Cotton Exchange, about 1 o’clock on the 14th of June, 1887.”
The statement of this witness is just as emphatic and as clear as-that of Airey. He says positively, that the defendant consented,, provided they could induce Carpenter to take one-fourth interest; ox-in other words, if Airey, Carpenter and he “would take the other-three-quarters interest.” To this they assented. On this theory all. subsequent negotiations and proceedings were conducted.
How does the defendant as witness meet this evidence ? To a\ pointed question propounded by his counsel he makes the following, reply, viz:
“ A. I remember a conversation with Col. Airey on that subject.. As far as my recollection goes, he asked me whether I thought a purchase of 10,000 bales would sustain the market, which was then, it appeared, in a somewhat uncertain condition; and I remember telling him I thought it would.
“Q,. Anything further?
“A. Nothing further,” etc. (Italics mixxe.)
During the course of his interrogation the following addtional! statement was made by the defendant, as witness, viz:
“ Q,. Do you undertake to say positively that you never gave such authority to Mr. Airey, as he has testified to here ?
“A. Ido. I do undertake to say positively that I have no recollection whatever of ever having given Mr. Airey any authority to enter, into such contract for me.”
Subsequently, when speaking of the demand made of him for the payment of the loss, he said:
“ I was rather surprised, because I was unconscious of any such transaction.”
Under ordinary rules of evidence, it appears to me quite evident that the clear preponderance of proof is in. favor of the existence of the pool agreement on the basis of one-fourth to each of the four parties named. The defendant may have forgotten the agreement, in the course of the multifarious transactions in which he was engaged at the time. But, in construing evidence, courts are bound to give-adhesion to the preponderance of testimony where witnesses appear equally trustworthy, and make contradictory statements.
*1045 But there is another circumstance, which is, to my mind, of great weight, in so far as plaintiffs are concerned, in interpreting the agreement of the parties, or rather in determining what the agreement was, and who were parties to it.
And that circumstance is that of the defendant putting up $8500 in margins on the 13th of July on the plaintiffs’ demand.
The proof is, that on the 12th of July, plaintiffs notified Victor Meyer in writing that they had transferred to his account “one-fourth interest in account of Carpenter & Co.” in certain future contracts.
On the following day they demanded of V. & A. Meyer & Co. $8500, as margins on future contracts, and a cheek for same was at once furnished. The letter of the 13th, distinctly stated that the sum demanded was the difference between contracts in New York and those in New Orleans, in favor of plaintiffs. On the following day plaintiffs’ suspension occurred. Two days subsequently, for the first tíme, was an answer made by V. & A. Meyer & Co., disavowing the Carpenter & Co. transaction, and the letter of the 12th as a mistake. No explanation is offered of the check sent to the plaintiffs for margins, nor is any demand made for its return. During the months of June and July, Victor Meyer was in Europe, and of course knew nothing about the transactions; but the defendant was present, and was personally cognizant of them, and conducted the correspondence.
In addition to these facts, the testimony of one of the plaintiffs is worthy of consideration. During the course of his interrogation the following occurred, viz:
“ Q,. Can you state what proportion of the $8500 that you called for, you attributed to the Carpenter & Co. transaction — what proportion of that whole amount you called for, on account of the Carpenter & Co. transaction?
“A. The major part of it. I did recollect exactly what the difference in the market might have been.
“ Q. If there had been no such account, for what amount would you have called on V. & A. Meyer & Co. instead of $8500?
“A. We would not have called at all, because the account closely approximated, in the letter, $200 or $300.”
This evidence confirms the statement in the letter of the 12th of July, and the demand of the 13th of same month. And in the *1046 defendant’s telegram to Victor Meyer (on the faith of the answer to-which his letter of the 15th was written to plaintiffs), he says:
“ Peet has suspended. We are not interested.” Defendant attempts an explanation of his putting up the margins as he did by-stating that he was at the time quite busy, and had full confidence in the plaintiffs. But the accounts of plaintiffs with the Meyer firm in New York and New Orleans, were introduced in evidence by defendant ; and an examination of them discloses that after they were balanced, there was a debit against plaintiffs of $17,052.77; but plaintiffs’ account against defendant shows a credit of $8400 in their favor after charging themseírves with that debit. Hence, admitting all that is shown by the Meyer accounts, that firm is still in arrears in. the amount stated. The only difference there is between the accounts is in reference to the credits; and in this respect, those of the plaintiffs are undoubtedly correct. They 'tally with plaintiffs’ demand for margins, and are supported by other evidence in th& record. This evidence was sufficient warrant for plaintiffs’ course of' dealing. Whether the original agreement was complete and perfect between the parties or not, the acts and conduct of the defendant, under the circumstances recited, were, in my opinion, quite sufficient, to confirm the plaintiffs’ belief in Oarpenter’s representations in ordering the purchase, and to act on that belief in paying the price of the cotton, and in holding same'for the defendant and his associates. I think plaintiffs are entitled to recover, and that the judgment appealed from should be reversed. For these reasons I must respectfully dissent from the views entertained by the majority of the court.